# Louisville & Nashville Railroad Co. v. Cornelius.

## Injury to Passenger.

(Decided November 19, 1912. 60 South. 740.)

1. *Carrier; Passenger; Injury; Negligence.*—A passenger cannot recover of a carrier damages for negligent injury without offering some proof in support of the negligence charged.

2. *Same; Proximate Cause.*—A passenger cannot recover of a carrier damages for negligent injury without offering some evidence to show that the negligence charged was the proximate cause of the injury.

3. *Same; Wantonness.*—Where a passenger had been carried a short distance beyond his destination when he requested the flagman to stop the train and let him off, and was told that this could not be done, and was carried to a large city several miles further on, the passenger was not entitled to punitive damages for being carried beyond his destination as no element of aggravation or insult was shown.

4. *Damages; Jury Question; Exemplary Damages.*—Whatever may be the allegations of the complaint, if the evidence offered does not authorize the imposition of exemplary damages, that question should not be submitted to the jury.

5. *Negligence; Action.*—Every action of trespass on the case for negligence involves different facts as a rule; so the facts of each case must largely determine the rule applicable thereto.

6. *Appeal and Error; Harmless Error; Instruction.*—Where the action was for damages for negligently carrying a passenger beyond his destination the refusal to charge that under the evidence the defendant was not bound to back its train to plaintiff's destination and let him off, was not rendered harmless by the giving of a charge that unless plaintiff was carried by the station willfully and intentionally, or under circumstances of aggravation, punitive damages could not be awarded, on the theory that there was in fact no evidence tending to show a willful or intentional carrying by the station.

APPEAL from Jefferson Circuit Court.

Heard before Hon. E. C. CROWE.

Action by W. F. Cornelius against the Louisville & Nashville Railroad Company. From a judgment for plaintiff, defendant appeals. Reversed and remanded.

[Louisville & Nashville Railroad Co. v. Cornelius.]

Charge 5, given at the request of appellant: "The court charges the jury that, unless you believe from the evidence that plaintiff was carried by defendant's station willfully or intentionally, or under circumstances of aggravation, then you cannot award the plaintiff any damages for the purpose of punishing the defendant."

Charge 11 is as follows: "The court charges the jury that, under the evidence in this case, defendant was under no duty to back its train to Gracies and let plaintiff off at that point."

TILLMAN, BRADLEY & MORROW, and FRANK M. DOMINICK, for appellant.   Count 1 joins trespass and case.— *City D. Co. v. Henry,* 139 Ala. 161; *B. R. L. & P. Co. v. Randall,* 149 Ala. 543; *B. R. L. & P. Co. v. Parker,* 156 Ala. 251.   This renders the count repugnant and inconsistent.—*Merrill v. Sheffield Co.,* 169 Ala. 252; *Cartledge v. Sloan,* 124 Ala. 596; *B. R. L. & P. Co. v. Lee,* 153 Ala. 82.   Demurrers No. 4, 5 and 8 raise these questions, and should have been sustained.   Count 4 was subject to the demurrer interposed.—*B. U. R. Co. v. Smith,* 90 Ala. 60; *B. R. & E. Co. v. Wildman,* 119 Ala. 554; *A. M. R. R. Co. v. Johnson,* 123 Ala. 196; *N. C. & St. L. v. Casey,* 56 South. 28.   Counsel discuss assignments of error relative to evidence, but without citation of authority.   The court erred in its oral charge. —*L. & N. v. Calvert,* 54 South. 184; *T. C. I. & R. R. Co.,* 55 South. 170; *Malcolm v. L. & N.,* 155 Ala. 337; *M. & O. v. Christian,* 146 Ala. 404; *So. Ry. Co. v. Williams,* 143 Ala. 212.   The court erred in submitting the question of wantonness to the jury.—*L. & N. v. Calvert, supra; Bowers Case,* 110 Ala. 328.   The court failed to lay down properly the essentials of wantonness.—*B. R. L. & P. Co. v. Williams,* 158 Ala. 381; *B. Ry. Co. v. Pinkard,* 124 Ala. 372.   The court erred in refusing the

[Louisville & Nashville Railroad Co. v. Cornelius.]

general charge as to count 3.—*A. G. S. v. Sellers,* 93 Ala. 9; *Dancey's Case,* 97 Ala. 338; *Yazoo v. Hardy,* 55 South. 967. On authorities cited to the first proposition in this brief, the court should have given the general charge as to count 1.

BLACK & DAVIS, for appellee. Counsel discuss the pleadings and in support of the complaint they cite.— *City D. Co. v. Henry,* 139 Ala. 611; 5 Mayf. sec. 4, subd. 74; 1 Words & Phrases, "aforesaid." As to what is a sufficient length of time as used in the complaint, see 7 Words & Phrases, 6763; *B. U. Ry. Co. v. Smith,* 8 South. 86; *So. Ry. Co. v. Burgess,* 42 South. 35; *Dilburn v. L. & N.,* 156 Ala. 228. The complaint did not require a greater duty on the part of the railroad than was required by law.—*B. & A. R. R. Co. v. Norris,* 59 South. 428. There is no error in not permitting Mrs. Cornelius to testify that she sometimes walked home from Birmingham.—*L. & N. v. Sandlin,* 28 South. 40; 1 Wig. 442. The exceptions to the oral charge were not sufficient to present that matter for review.—*L. & N. v. McLendon,* 63 Ala. 256; *Farley v. The State,* 72 Ala. 170; 35 Cyc. 1795. The court's definition of negligence was proper.— *A. C. G. & A. v. Bullard,* 47 South. 580. It was the duty of the train to back up to the station and hence, the court properly refused the charge stating that it was not.—*L. & N. v. Daney,* 11 South. 791; *Seller's case,* 93 Ala. 9; *Yazoo R. R. Co. v. Hardy,* 55 South. 967. The court properly refused affirmative charge as to count 1.—*City Del. Co. v. Henry,* 139 Ala. 161. On the above authorities, the other charges were properly refused.

PER CURIAM.—It is said that 65 per cent, of the cases now pending in the states of the Union are damage

suits. This situation is due to the rapid development of our natural resources, and the constant demand for rapid freight and passenger transportation. As the conditions out of which such litigation naturally springs constantly increase, it is but natural that litigation growing out of such conditions should correspondingly increase. The more passengers and the more common carriers we have, the more chances we have that some passengers will be injured if the servants of common carriers are neglectful of their duties; and, the greater the number of servants which a public service corporation has in its employ, the greater the possibility that some of such servants will be neglectful of their duties, and by reason thereof fellow servants or members of the public suffer injuries.

Out of respect to the above situation—as a large percentage of appeals from the judgment of trial courts in such cases come within the jurisdiction of this court—we undertook, in the case of *Birmingham Water Works Co. v. Martini,* 2 Ala. App. 652, 56 South. 830, to define and explain the office of a special action of trespass on the case and to declare what, as actual damages, was recoverable in such action. As the question as to when and why exemplary damages may be allowed in such actions was also constantly recurring in this court, in the case of *Birmingham Water Works Co. v. Keiley,* 2 Ala. App. 629, 56 South. 838, we undertook to declare the true rule which should govern all courts when, in such an action, the plaintiff claims such damages of the defendant. The above cases, when read together, will, we think, fully illustrate our views as to the law upon the above subjects. See, also, *B. R. L. & P. Co. v. Murphy,* 2 Ala. App. 588, 56 South. 817; *Bigbee Fertilizer Co. v. Scott,* 3 Ala. App. 333, 56 South. 834.

1.  There were several counts to the complaint in this case, and there was a demurrer, with many grounds, to each count of the complaint.  The action of the trial court in overruling the defendant's demurrer to each count of the complaint is separately assigned on this record as error, and these assignments of error are pressed upon us for our attention.  There were also during the trial, several exceptions reserved by appellant to the action of the trial court in its rulings on the admission or rejection of evidence, and these rulings are also assigned as error, and they, too, are pressed upon us for our attention.  The facts of this case, however, are extremely simple, and we devote ourselves to a discussion of the merits of the case.

It does not matter how skillfully a plaintiff may state, in his complaint, a cause of action for simple negligence against a defendant, he can recover nothing for such negligence, unless, when the trial is had, he offers some evidence of the negligence charged in the complaint, and that the plaintiff was injured by such negligence.  It does not matter in what terms, in his complaint, a plaintiff claims of a defendant, in such an action, exemplary damages, he can recover nothing, if he fails to offer some evidence from which a reasonable inference can be drawn that the wrong complained of was perpetrated under such circumstances as would justify a jury, within their discretion, in awarding exemplary damages.

In such a case, regardless of the allegations of the complaint, the subject of exemplary damages, in the absence of any evidence authorizing their imposition, should not be submitted to the jury.  It is a familiar proposition that, when a defendant is charged with murder, malice may be presumed from the use by the defendant of a deadly weapon in the commission of the homicide, unless

the circumstances attending the use of the weapon rebut the idea of malice. And so, in cases like the present, when the plaintiff's own evidence, if accepted as true, shows that the negligence complained of was an act of simple negligence only, and all the other facts and circumstances of the case rebut any other theory, then certainly, in such a case, the trial court should not submit the subject of exemplary damages to the jury.

2. The facts in this case are that on the 26th day of December, 1909, the appellee (plaintiff in the court below), with his wife and baby, boarded appellant's (defendant's in the court below) train at Pelham for Gracies. Gracies appears to be a small station on appellant's railroad, and it further appears that appellee's home, at that time, was on a public highway about five miles from Gracies. His home seems only to have been three miles from Birmingham; but, in going to his home from Birmingham, it was necessary to cross a mountain. The night was cold, and there was a high wind. Appellee's baggage consisted of a valise. Before leaving Pelham for Gracies, appellee had arranged with his brother to have a conveyance at Gracies on the arrival of the train to convey him and his wife and baby to their home. The conveyance was at Gracies when appellee's train reached that point; but, according to appellee's evidence, the train, when it reached Gracies, did not stop there for a length of time sufficient for appellee, incumbered as he was with a valise, a baby, and a wife, by the exercise of reasonable diligence, to get off the train before it left. On this subject, the evidence was in dispute; but there is no dispute about the fact that appellee, his wife, and his baby were on the train when it left Gracies; that Gracies was five miles from Birmingham; that the train, after it left Gracies, did not stop until it reached Birmingham; that, when the train reached Birmingham, ap-

pellee, his wife, and baby alighted from the train; that they caught a street car at or near appellant's station, which carried them about a mile in the direction of their home; that the appellee and his wife walked from that point, across the mountain, carrying the baby and the valise with them to their home; that appellee, to protect the baby from the cold and the wind, took off his coat and wrapped the baby in it; that appellee caught a severe cold and suffered physical discomfort; and that, shortly before reaching his home, the party stopped at the home of a neighbor, where a fire was made for them. Appellee's evidence further tended to show that the train reached Birmingham in the night; that he was unable to find lodging in the city or a conveyance to carry him to his home; and that, for that reason, he walked home as above stated.

On the subject as to what occurred when the train reached Gracies and after it left that point, we quote the following from the testimony of appellee: "The train stopped at Gracies what might be called a quarter of a minute, something like that. I started to get off. I made preparations before the train stopped, and told my wife to have the baby ready. The baby is one year old. When the train stopped, I had started before the train stopped, and we made our start for the front of the car, and it was crowded between the front of the car and not so badly crowded at the back; but the door at the back was locked, and we made our way out the front of the car where the others had got off at the other stops before. We got something like between five and six seats, maybe three seats or five, I did not pay any particular attention to it, before the train started. That was something like two-thirds of our way to the door. When the train started, I kept pushing my way to the front of the train until I saw the train had its sway in

[Louisville & Nashville Railroad Co. v. Cornelius.]

moving, and then I told my wife to go back and sit down,
and I placed my grips down and went to hunt the con-
ductor and flagman. I did not find them. They were not
at the end of the coach when I went to find them. In
something like a minute and a half, maybe two minutes,
I found the flagman. He had come across from the
other coach, from the coach along ahead to the coach at
the rear end. I said to him, 'Why didn't you stop long
enough for us to alight at Gracies?' He said that he
did. I told him he did not stop long enough for us, my
wife and baby, to get off. I said, 'I had my conveyance
at that place to get off, and I asked him if he could
carry us back, and he said he couldn't.' There was
nothing else said between us. We came on to Birming-
ham. When I asked him to go back, he said he couldn't
go back. I explained to him why I wanted to go back.
I told him I had my wife and baby, and had a conveyance
at Gracies for us to go home, and it would be inconven-
ient for us to get out of town, out of Birmingham. I
did not tell him how far I lived from Birmingham. * * *
The man I was talking to was the flagman. The con-
ductor was a different man from the flagman. * * *
The station was called out before the train got there.
I heard it called. It is not a fact that, after the train
passed Gracies, I came to the flagman and claimed that
the station had not been called. That is not so. I do
not think that the train stopped at Magella. I know
where Magella is. It is just this side of the mountain—
this side of Gracies gap. I really cannot tell how far
it is from Gracies. I think it is about a mile and a
half. When I had the conversation with the flagman and
told him about my wife being on the train and the con-
veyance being at Gracies, it was about a minute and
a half after the train had left Gracies. At that time
the said train was still moving and had gotten back to

its usual speed. It was some distance from Gracies before I could find the flagman. It was either just before we got to Magella or right about that time. Magella is about a mile and a half away from Gracies."

We have quoted extensively from appellee's testimony as it appears in the bill of exceptions, for it is upon that testimony—the facts as testified to by him and the reasonable inferences to be drawn from those facts—that his right to have the question of exemplary damages submitted to the jury in this case depends. Admitting the truth of every quoted word of appellee (and he was corroborated by his witnesses in many ways in the above statement, and was also contradicted in many ways by appellant's witnesses), was the subject of exemplary damages properly submitted to the jury? Was there any evidence in the case which justified the submission of that subject to the jury for their consideration?

3. It is contended by appellee that as it was the duty of appellant's conductor to stop appellant's train at Gracies for a sufficient length of time for appellee, situated as he was, to have, by the exercise of reasonable effort, alighted from the train with his wife and baby, and as there was evidence tending to show that the conductor negligently failed in that duty, it was, when appellee informed the flagman of the situation, the duty of appellant's servants in control of the train, upon appellee's request to do so, to stop that train and return with him to Gracies; that appellant's servants, charged with the last-mentioned duty, willfully and knowingly refused to stop the train and return with appellee to Gracies; and that therefore, under the tendencies of some of the evidence in the case, the question of vindictive damages was one for the jury. It is not contended by appellee that the mere failure of the appellant's conductor to stop the train at Gracies for a

sufficient length of time for the appellee, by the exercise of reasonable diligence, to have alighted from the train (and on this subject the evidence was in sharp conflict) constituted more than an act of simple negligence. The act for which appellee claims that he was, under the evidence, entitled to exemplary damages, at the discretion of the jury, was the willful and knowing failure or refusal of appellant's servants to stop the train and return with appellee to Gracies after appellee had informed the flagman of the situation. On the above subject, the appellee cites us to *Sellers' Case*, 93 Ala. 9, 9 South. 375, 30 Am. St. Rep. 17, and to the case of *L. & N. R. R. Co. v. Dancy*, 97 Ala. 338, 11 South. 796. Before discussing these cases, we desire to say that, while the facts of a case do not make the law, they do determine what rules of law shall fix the rights of the parties to a suit. There is one measure for dry goods and another measure for liquids. It is, indeed, but a truism that, while in very many ways all men are alike, nevertheless there is something in the ego—the individuality —of every man which differentiates him from his. fellows and renders him a distinct personality.

This is true, as a general rule, of every special action of trespass on the case. No two are, speaking generally, exactly alike, and the facts of each must and do declare the rules which shall be applied to those facts.— *Birmingham Water Works Co. v. Martini, supra; Birmingham Water Works Co. v. Keiley, supra.* The facts in the present case are, in several important particulars, entirely unlike the facts in the above two cases, and for that reason, and for that reason only, some of the rules, perfectly sound when applied to the facts of those cases, cannot be applied to the facts of this case without violence to the law itself.

4.   In the case of *Alabama Great Southern R. R. Co. v. Sellers, supra,* there was evidence tending to show that the train did not stop at the station, but proceeded from 200 to 400 yards beyond it, where it did stop; "that it was raining at the time; that plaintiff requested the conductor to move the train back to the house, but he pretended not to hear, and told the plaintiff she must get off; that the rain increased and was falling heavily, and a high wind was prevailing, when she did get off; that she had a young baby in her arms, and was otherwise incumbered with a valise; that, because of these impediments, she could not use an umbrella which she had; that she alighted in obedience to the direction of the conductor in this driving rain, and walked back to the station house, getting thoroughly wet, and in consequence became quite sick and was so for three months." The above conduct of the conductor amounted to nothing less than brutality, and the Supreme Court properly said:   "We cannot hesitate to affirm that this misconduct on the part of the defendant's employee, with knowledge of the situation, was such a willful wrong, committed in such reckless disregard of the necessarily injurious consequences to the plaintiff, as authorized the jury to punish the defendant therefor by the imposition of exemplary damages."

In the case of *Louisville & Nashville R. R. Co. v. Dancy, supra,* the conductor was unable to stop his train at the station because the brakes would not work, but continued his efforts to stop, and did stop the train about a mile from the station.   The question as to whether the plaintiff, in that case, then voluntarily left the train, or whether she left it under the orders of the conductor at that point, was in dispute.   Under the facts of that case, the Supreme Court held that, "when the train ran past the station and stopped, it was the conductor's duty

to cause it be returned, in order that plaintiff might depart at the station; and if that duty was not waived by the plaintiff, and was not performed, plaintiff is entitled to an action. If the conductor failed to return, or offer to do so, and compelled the plaintiff to leave the train against her will, an action lies. On the question of vindictive damages, the case of *Railroad Co. v. Sellers*, 93 Ala. 9, 9 South. 375, 30 Am. St. Rep. 17, and the authorities collated in *Railroad Co. v. Johnston*, 79 Ala. 436, will furnish sufficient guides."

In the instant case, there was no circumstances indicating oppression, unkindness, ill will, insult, or reckless indifference. Viewed in its most favorable light to appellee, his evidence shows that, after he informed the flagman of the circumstances, he asked the flagman if he could not stop the train, and the flagman told him that he could not. That was all, and appellee was carried, not to a small station, but into the city of Birmingham. The train was a mile and a half from Gracies when the above request was made, and was then running at its accustomed rate of speed. It is a matter of common knowledge that every well-regulated railway system has, on each of its divisions, a train dispatcher, who keeps, by constant telegraphic correspondence, in touch with every train on his division. He knows where every train is, the rate, or about the rate, at which it is traveling, when it leaves a station, and when it will reach the next station on the line. The arrival at and departure from stations of each train is made dependent upon the known movements, speed, and place of every train upon the division. The safety of the traveling public—human life—depends upon all this; and the emergency should be great indeed that would justify the conductor of any train, and especially a train filled with human beings, upon any well-regulated railroad, in stop-

ping his train without orders from or the knowledge of his train dispatcher a mile and a half from a station, and in backing back into a station. When a collision occurs and human lives are thereby destroyed, the first question that presents itself to the mind is, "Who disobeyed orders?" Sometimes the answer comes that one or the other of the conductors overlooked an order, and sometimes that a station agent failed to give a signal which the train dispatcher had ordered him to give. In this case, as a matter of common knowledge, we know that the train was running on orders given to the conductor by his train dispatcher, who knew nothing, and could have known nothing, of the fact that appellee would be or had been carried by Gracies. This being the true situation—a situation which experience and practical common sense has demonstrated to be true—there was no sane course open to appellant's conductor, situated as he was when appellee's circumstances were called to his attention, but to take that safe side, which the importance of his trust demanded, and proceed upon his course. In truth, if the law was as appellee, under the facts of this case, would have it to be, every time a passenger, by reason of some act of simple neglect of a railroad's servant, is carried by the point of his dentination for an appreciable distance, such passenger, by demanding that the train be stopped and backed into his station— a thing which ordinarily would be a dangerous thing for a conductor to do—can, at the discretion of the jury trying his suit for the damages suffered thereby, receive punitive damages. The question now under discussion was recently before the Supreme Court of Mississippi in the case of *Yazoo R. R. Co. v. Hardie,* cited by counsel for appellant, and appellee in their briefs, and in that case that court through Mays, C. J., in an able, exhaustive, and carefully considered opinion, determined

that, under facts presenting the identical questions presented by this record, the plaintiff was not entitled, as matter of law, to punitive damages.—*Yazoo R. R. Co. v. Hardie,* 100 Miss. 132, 55 South. 42, 967, 34 L. R. A. (N. S.) 740, 742.

5. It is contended by appellee that, as the court charged the jury, at the written request of appellant, that unless they believed from the evidence that plaintiff (appellee) was carried by defendant's (appellant's) station at Gracies willfully and intentionally, or under circumstances of aggravation, then the jury could not award the plaintiff any damages for the purpose of punishing the defendant, therefore the refusal of the trial court to charge the jury, at appellant's written request, that, if they believed the evidence they could not award the plaintiff exemplary damages was, if error, an error without injury. The theory of appellee on this subject is that as there was no evidence tending to show that appellee was carried by the station willfully and intentionally, or under aggravating circumstances, and as the court at the written request of appellant gave charge 5 (which the reporter will set out), it, in effect, gave charge 11, which the reporter will also set out. We do not agree with appellee on this subject; and the oral charge of the court shows conclusively that the trial judge did not, when he gave charge 5 at the written request of appellant, think that he had withdrawn the subject of punitive damages from the jury. The bill of exceptions shows affirmatively that the trial judge did not withdraw the subject of punitive damages from the jury; but, on the contrary, that he left that subject before them. In our opinion the trial court committed reversible error in refusing to give charge 11, which appellant, in writing, requested it to give to the jury. For aught that we know, the jury may have concluded, after

weighing all the evidence in the light of the charge of the court, that, taking into consideration the conditions under which appellee was traveling, the fact that the train when it reached Gracies "just-sort of slowed up momentarily," as one witness testified, or that it only remained there long enough for appellee to get "only about three seats up the aisle" from his seat on the train, as another witness testified, or that it stopped "a quarter of a minute, something like that," as another witness testified, was a fact from which "circumstances of aggravation" might be inferred; and that, under the language of that charge, taken in connection with the fact that the court had left the question of exemplary damages before them, they were authorized to assess punitive damages.  About this we do not know; but we do know that charge 11 correctly stated the law of this case, and should have been given in the language in which it was asked.

6.    The writer of this opinion knows how difficult it frequently is for a practicing lawyer to determine the rights of his client under the facts as they are given to him.  Sometimes, we think, exemplary damages are claimed when the facts, at best, cannot do more than authorize a jury to consider the question of aggravation of damages.—*Southern Ry. Co. v. O'Bryan,* 119 Ga. 147, 45 S. E. 1000; 13 Cyc. 66, and notes.

7.    In our opinion, under the facts of this case, with its various conflicts, if appellee, under the counts of the complaint on which the case was tried, is entitled to recover anything of appellant, it is because appellant's servants, when the train stopped at Gracies, failed to give appellee a reasonable time, taking into consideration the situation under which he was traveling, within which to alight from the train.  There is a conflict in the evidence on this subject; but appellee's evidence

tends to show that the train did not remain at Gracies for a period sufficiently long for him, by the exercise of reasonable diligence, to alight from the train.

The only count in this case alleging willfulness or wantonness, which went to the jury, and which involved the subject of punitive damages, was the count in which the claim to such damages was based upon the failure or refusal of appellant's servants to back the train to Gracies station after the station had been passed; and under that count the appellee was not, under the facts set out in the bill of exceptions, entitled to exemplary damages.

Reversed and remanded.

NOTE.—The foregoing opinion was prepared by Judge DE GRAFFENRIED while he was a judge of this court, and is adopted by the court.